CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
2/17/2026
LAURA A. AUSTIN, CLERK
BY: s/c Kemp
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

|  |  |  |
|---|---|---|
| STACEY S., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:24-cv-00834 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:    Hon. Thomas T. Cullen |
| SECURITY, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Stacey S. ("Stacey") filed suit in this court seeking to overturn the Commissioner of Social Security's ("Commissioner") final decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Stacey suffers primarily from diabetes mellitus, stroke-related residual effects, shoulder capsulitis, obesity, depression, and anxiety. After a hearing, an administrative law judge ("ALJ") concluded that, despite his limitations, Stacey could still perform a range of light work. Stacey challenges that conclusion, calling for reversal and remand on three primary grounds. After a thorough review of the record, it is apparent that the ALJ considered all the relevant evidence and that his decision is supported by substantial evidence. Accordingly, his decision will be affirmed.

## I.    STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Stacey filed for DIB benefits on February 28, 2022. (*See* R. 76.) He claimed a disability onset date of October 20, 2021, resulting from myriad health issues: status post stroke; stroke symptoms; bilateral cataracts causing blurred vision; uncontrolled diabetes; diabetic neuropathy; right shoulder arthritis; low back pain; headaches; lower extremity edema; varicose veins; anxiety; depression; and difficulty speaking and memory problems. (*See* R. 266–79.) His claims were denied initially on March 8, 2023 (R. 104) and upon reconsideration on January 9, 2024 (R. 119).

After his denial, Stacey requested a hearing before an ALJ. (R. 131.) The ALJ held that hearing on June 12, 2024 (R. 44–75) and issued a written decision denying Stacey's claim on June 24, 2024 (R. 17–35). Although the ALJ found that Stacey suffered from several severe impairments—specifically "diabetes mellitus with peripheral neuropathy and chronic kidney

disease; residual effects of possible transient ischemic attack or cerebrovascular accident; shoulder capsulitis; cervicalgia; ulnar neuropathy; hypertension; obesity; depression; and anxiety"—he determined that Stacey could still perform work at the light level, with additional limitations. (*See generally id.*) Stacey appealed that decision, but the Appeals Council denied his request for review, making the ALJ's written decision the final word of the Commissioner as of October 9, 2024. (*See* R. 1.)

## A.    Legal Framework

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work-related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—

including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from [that] evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted) (first brackets in original). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B.    Medical Evidence

On January 20, 2021, Stacey saw Dr. Mark Taylor at Salem Family Medicine to address post-COVID-19 symptoms. At the time, he reported elevated sugar and bad balance and told his provider that he stopped checking his blood sugar. (R. 360.) Dr. Taylor diagnosed Stacey with benign essential hypertension, mixed hyperlipidemia, chronic anxiety, type-2 diabetes uncontrolled, and situational depression. (R. 361.) On February 8, 2021, Stacey saw Dr. Jadeep Wander at The Center for Emotional Care for an initial psychiatric evaluation, where he reported low energy and consistent anxiety. (R. 814.) Dr. Wander wrote that Stacey presented

with a depressed and anxious mood and flat affect, but that his memory, judgment, attention, and concentration were all intact. (R. 815.) Dr. Wander diagnosed Stacey with major depressive disorder, panic disorder with agoraphobia, and generalized anxiety disorder, and prescribed Prozac and Hydroxyzine. (R. 816.) Throughout the remainder of 2021, Stacey had three follow-up appointments with Dr. Wander, who noted that Stacey was doing "a little worse" and adjusted his medications to accommodate Stacey's increasing stress and anxiety. (R. 805, 809, 811.) On November 30, 2021, Stacey saw Dr. Taylor for a follow-up appointment; Dr. Taylor noted that Stacey had not taken his medication for three weeks and that his blood sugar was too high. (R. 358.) He further noted that Stacey had not left the house in three weeks or go to previous referral appointments. (*Id.*) Stacey saw Physician Assistant ("P.A.") Brett May on December 8, 2021. (R. 362.) P.A. May noted that Stacey's imbalance was moderate-to-severe in severity and that he had not been compliant with taking his insulin and medication. (*Id.*) He scheduled Stacey for an MRI of the brain and referred him to a neurologist. (*Id.*)

On December 20, 2021, Stacey went to the emergency department at Lewis Gale Medical Center with a right-sided facial droop, slurred speech, drowsiness, and inability to balance. (R. 550–51.) A CT scan of his head and neck showed no evidence of acute stroke, and his symptoms improved after getting his blood sugar under control. (R. 538–39.) Stacey was instructed to take his insulin more consistently. (R. 539.) On December 22, 2021, Stacey saw Dr. Nathan Luke, who wrote in his report that Stacey's MRI showed a "centrally located pontine lesion" (damage to a part of the brain stem) but no other signs of damage. (R. 380.) Dr. Luke also reported that Stacey's BMI was 35.15 and that he had chronic shoulder pain. (R. 380.) Stacey had an X-Ray on his shoulder, which Dr. Luke noted showed some mild

arthritis. (R. 384.) Stacey reported that the pain improved after stretching and using Icy Hot;

Dr. Luke gave him an injection and referred him to physical therapy. (R. 386.) Dr. Luke also

started Stacey on Ozempic. (R. 385.) Dr. Luke made no changes to his treatment regimen

during follow-up appointments in January 2022, and he noted that Stacey was feeling better

and tolerating his medications well. (R. 388.)

On February 16, 2022, Stacey saw Dr. Clement Elechi, a neurologist, for balance

problems, weakness, and drooling. (R. 369.) Dr. Elechi noted that Stacey appeared "somewhat

unwell" and that he had bilateral atrophy of the small hand muscles and possible mild finger

weakness, but everything else in his examination was normal. (R. 371.) Dr. Elechi diagnosed

Stacey with brainstem infarction, abnormal brain MRI, and peripheral polyneuropathy, but he

noted that Stacey had "[e]xcellent control of his risk factors including diabetic control and

blood pressure control[.]" (*Id.*) Stacey's BMI was 35.78. (R. 370.)

An MRI of Stacey's brain on April 5, 2022, showed "essentially unremarkable" findings.

(R. 527.) Stacey saw Dr. Luke for a follow-up appointment a week later, where he reported

continued shoulder pain and depression with anxiety, though he began walking on his own

(without a cane). (R. 392.) Stacey's BMI was 33.96. (R. 393.) Dr. Luke's examination of Stacey

yielded normal results, including no visual deformities and full range of motion in the right

shoulder, and he noted that Stacey was "doing well with significant improvement in A1C." (R.

395.) Throughout June and July 2022, Stacey had a few follow-up appointments with Dr. Luke

and Dr. Elechi, respectively, with not much change to his symptoms other than Dr. Elechi

noting atrophy of the small hand muscles. (R. 366.) Stacey continued to slowly lose weight,

with his BMI down to 31.94 by late July 2022. (R. 487.) On July 28, 2022, Stacey saw P.A.

Jessica Gillispie for an evaluation of his depression and anxiety, which he reported had worsened over the past two years. (R. 460.) Stacey also reported that he had lost 65 pounds since his stroke and was making healthier decisions. (*Id.*) P.A. Gillispie's constitutional and musculoskeletal exams yielded normal results, and she adjusted Stacey's medication for his depression and insomnia. (R. 462–63.)

On August 11, 2022, Stacey went to the emergency department at Lewis Gale Medical Center for an evaluation of right foot swelling and discoloration. (R. 518.) A physical exam found swelling along the dorsal aspect of the distal metatarsals, bruising of the right second toe with spread to medial aspect of the right third toe, diminished sensation up to his ankles, and full range of motion of bilateral toes and foot. (R. 519.) An ultrasound of Stacey's abdomen showed fatty liver and gallstones, but otherwise normal results. (R. 512–13.) Stacey had various medical appointments in September and October 2022, where he reported neuropathic pain in both feet and improvements in his anger issues. (R. 465, 608.) On December 5, 2022, Stacey saw Nurse Practitioner ("N.P.") Chelsey Burnette, complaining of chronic shoulder pain and anxiety and depression that was not relieved with his current medication, though he denied depressed moods and hopelessness. (R. 470–71.) He had gained back some weight since his July 28 appointment. (R. 471.) Stacey was evaluated for his gallbladder disease and gallstones, and medical examinations yielded largely normal results, with tenderness in his abdomen improving between December 2022 and January 2023. (*See* R. 628–29, 631–32.) His follow-up appointments between January and March 2023 for his foot issues, diabetes, and right-shoulder pain showed no change in his conditions, and his medication regimen was adjusted. (*See* R. 610, 623, 619–21, 625, 818–20.)

On March 27, 2023, Stacey saw Dr. Wander again, reporting that he was feeling more rage and sadness, as well as ongoing anxiety and panic attacks. (R. 799.) Dr. Wander noted that Stacey's mood was depressed and anxious; that his attitude was guarded and suspicious (though his thought content was coherent); that his judgment was fair; and that he exhibited good attention and concentration. (R. 801.) He prescribed Stacey Wellbutrin for depression and Hydroxyzine pamoate for anxiety. (R. 805.) In April, Stacey returned and reported the same issues; Dr. Wander increased his Wellbutrin and continued him on Hydroxyzine pamoate. (R. 789, 793, 796, 798.) Dr. Wander reported that Stacey was a "little worse." (R. 793, 798.)

In May 2023, Stacey went to follow-up appointments for his feet and diabetes. Dr. Rubiano, a podiatrist, noted absence of sensation over the plantar surface of both feet and absence of posterior tibial pulses in both legs, and continued Stacey on Gabapentin and recommended continued monitoring. (R. 704–05.) Family Nurse Practitioner ("F.N.P.") Beth Hite noted that Stacey reported that his foot still goes numb when driving, but her physical examination of Stacey yielded normal results. (R. 870, 874.) Stacey's BMI was 28.55. (R. 871.) Stacey saw Dr. Wander in June and July 2023, continuing to report depression and anxiety, as well as thoughts of death (though he denied active or passive suicidal thoughts). (R. 779, 784, 789.) Dr. Wander's assessments of Stacey remained the same, and he continued Stacey's medication regimen and recommended that he see a therapist. (R. 781, 786.)

On August 24, 2023, Stacey went to Dr. Stephen Cromer for an orthopedic evaluation and reported bilateral shoulder pain, and Dr. Cromer found diminished range of motion in both shoulders. (R. 747–48.) Dr. Cromer diagnosed Stacey with chronic pain and adhesive

capsulitis of both shoulders and performed steroid injections of both the right and left glenohumeral joints. (R. 748, 753.) An X-ray of Stacey's right shoulder revealed moderate AC joint osteoarthritis and a calcific legion at the distal clavicle, and an X-ray of his left shoulder yielded normal results. (R. 748.) Stacey attended several physical therapy sessions in September and October 2023, with his provider noting that Stacey reported feeling better and that he was complying with the prescribed exercises. (R. 729–38.) Stacey returned to Dr. Comer on October 24, 2023, reporting improvements in his right shoulder and an improved range of motion in his left shoulder. (R. 724.) Dr. Comer noted that his left shoulder still exhibited a loss of range of motion, and he would consider a suprascapular nerve block and Hydro dilation procedure if it did not get better. (R. 728.) At a follow-up appointment on December 5, 2023, Stacey reported to Dr. Comer that he had intermittent sharp pain in his left shoulder, though he noted that both shoulders were generally doing well. (R. 1037–38.)

Stacey saw Dr. Wander four times between November 2023 and February 2024, noting his ongoing depression and anxiety. In December, Dr. Wander recorded that Stacey's attitude was guarded and negative; that his mood was depressed and anxious; that his "fund of knowledge" was inadequate; and that he exhibited limited attention and concentration. (R. 950–51.) Dr. Wander's evaluation in February revealed that Stacey was improving emotionally, and he noted that Stacey's mood was euthymic and anxious, his affect was appropriate, his concentration and attention were good, and his fund of knowledge was intact. (R. 960–61.) Dr. Wander further noted that there were no acute changes and continued Stacey on his medication regimen. (R. 962.) Stacey saw Dr. Wander a few more times between March and May 2024, reporting that his medication was helping and that his anxiety was manageable,

even though he was stressed about work and his disability hearing. (R. 964, 968, 998.) Dr. Wander noted that Stacey's attitude was cooperative, his mood was euthymic, his affect was appropriate, his judgment and insight were fair, his attention and concentration were good, and his fund of knowledge was intact. (R. 965, 970–71, 1000–01.)

Stacey returned to Dr. Rubiano for follow-up podiatry appointments in February and April 2024, where objective examinations showed that the absence of sensation in the plantar surfaces of both feet remained, though his ankle and foot strength were at 5/5 and the range of motion in his foot was normal. (R. 943–44, 946–47.)

## C.    Opinion Evidence

On initial review of Stacey's DIB application, state agency examiners Robert McGuffin, Jr., M.D., and William Carne, Ph.D., found that Stacey suffered several severe impairments—specifically peripheral neuropathy, diabetes mellitus, and obesity—but that his hyperlipidemia, cataracts, essential hypertension, chronic kidney disease, depression, anxiety, and other disorders of the nervous and gastrointestinal systems were not severe. (R. 80.) Dr. McGuffin noted that Stacey had stroke symptoms in late 2021 and early 2022, and that at that time, his diabetes was poorly controlled. (R. 83.) But he also found that Stacey's diabetes showed improvement, his A1C was "much better[,]" his brain MRI was normal, and that later visits with his primary care doctor showed that "he no longer ha[d] abnormal gait or need for [a] cane." (*Id.*) Overall, Dr. McGuffin concluded that Stacey had improved and was "in stable condition." (*Id.*) Based on these findings, Dr. McGuffin opined that Stacey had the RFC to perform "light" work with restrictions on balancing and climbing ramps, stairs, ladders, ropes, and scaffolds. (R. 82–84.) Dr. McGuffin found that Stacey was able to stand, walk, and sit for

"[a]bout 6 hours in an 8 hour workday" and that he should lift occasionally no more than 20 pounds and frequently no more than 10 pounds. (R. 82.) Finally, Dr. McGuffin included an environmental limitation that Stacey should avoid concentrated exposure to hazards, such as machinery and heights. (R. 83.) Based on his determination of Stacey's RFC and the environmental and exertional limitations he believed were appropriate, Dr. McGuffin opined that Stacey was not disabled under the terms of the Act. (R. 82–84.)

As it related to Stacey's depression and anxiety, Dr. Carne opined that the record demonstrated that Stacey has a "normal mental status" and, even following his stroke-like symptoms, "there was no evidence of cognitive deficit or speech abnormality." (R. 81.) Further, Dr. Carne found that Stacey's "complaints of poor memory and fits of rage were not reflected in the objective data" because "[r]ecords indicate his symptoms [were] adequately managed with Wellbutrin." (*Id.*) Therefore, Dr. Carne found that Stacey's mental-health symptoms were not severe.

Stacey appealed and, on reconsideration, state-agency examiners Jack Hutcheson, Jr., M.D., and Louis Perrott, Ph.D., opined that Stacey suffered several severe impairments— specifically peripheral neuropathy, diabetes mellitus, obesity, and other and unspecified arthropathies—but that his hyperlipidemia, cataract, essential hypertension, chronic kidney disease, depression, anxiety, and other disorders of the nervous and gastrointestinal systems were not severe. (R. 92.) Dr. Hutcheson noted that, since Stacey's stroke symptoms in late 2021, his diabetes and A1C showed improvement. (R. 95.) He also noted that his April 2022 brain MRI was normal, that he no longer had abnormal gait or need for a cane, and that he "had injections for bilateral adhesive capsulitis of both shoulders with improvement." (*Id.*)

Finally, Dr. Hutcheson noted that a December 2023 exam showed normal range of movement, sensation and strength. (*Id.*) Dr. Hutcheson concluded that the administrative findings of the initial decision "remain consistent with the totality of the evidence," and he upheld Dr. McGuffin's RFC findings and exertional and environmental limitations. (R. 94–95.)

As for his depression and anxiety, Dr. Perrott found that Stacey had normal mental status and no cognitive defect and speech abnormality post-stroke. (R. 93.) He also noted that Stacey had not reported severe mental-health symptoms, and that any symptoms he reported "[we]re adequately managed with Wellbutrin and Hydroxyzine, and other psychotropic meds." (*Id.*) Accordingly, Dr. Perrott found that Stacey's depression and anxiety were non-severe impairments and that the findings in the initial decision "remain consistent with the totality of the evidence." (*Id.*)

## D.    Relevant Testimony

In a function report submitted in support of his application, Stacey averred that, due to his diabetic neuropathy, he cannot stand for long periods, has swelling and a lack of feeling in his feet, falls frequently, and has balance issues. (R. 293.) He also stated that he struggles to find the right words, has trouble speaking and poor memory, and finds it difficult to focus and concentrate. (*Id.*) Further, he explained that his physical ailments and depression make it more difficult to care for himself and be social. (R. 294–96.) Finally, Stacey reported that he sometimes has fits of rage. (R. 296.)

At a hearing before the ALJ, Stacey testified that, in 2021, he stopped taking insulin for his diabetes due to mental-health issues and he had to go to the ER. (R. 53.) He stated, however, that his "diabetes is under control really well right now" since he returned to taking

his insulin. (*Id.*) He testified that, while he has lost weight and was able to go to the gym for 20 minutes three times a week, he was only able to complete workouts where he is lying down or sitting, and he is still unable to perform household tasks like mowing the lawn. (R. 56–57.) He further testified that his diabetic neuropathy causes loss of feeling in his feet, shooting pain throughout his body, and a loss of motor skills in his hands and fingers, making everyday and job-related tasks more difficult. (R. 58–60.) As for his part-time job as a packager at Deli-Matic (where he continued to be employed at the time of the hearing), he testified that he can take breaks when needed and his coworkers do all the lifting in his place. (R. 61–62.) Finally, he testified that he is generally anxious and has become more irritable due to his pain. (R. 57, 66.)

A vocational expert also testified and opined that, given the hypotheticals and limitations posed by the ALJ, Stacey could not perform his past relevant work as a kitchen manager because that work requires medium exertion and was inconsistent with the "significant vocational adjustment" provided by the ALJ. (R. 69–70.) He opined that Stacey could instead perform various jobs at the light work level, such as a cafeteria attendant, routing clerk, and mail-room clerk, and at the sedentary level, such as an information clerk or ticket checker. (R. 70–71.) On cross examination, Stacey's counsel added several limitations to the hypotheticals posed by the ALJ: the need to take time off outside of normal work breaks and only occasional handling and fingering. (R. 72–73.) The vocational expert answered that a loss in productivity of 15 percent or greater would preclude work at any exertional level, and that limiting handling and fingering to occasional would make every job he listed inappropriate. (R. 73.)

## E.    The ALJ's Opinion

In the operative decision, the ALJ concluded that Stacey suffered from: "diabetes mellitus with peripheral neuropathy and chronic kidney disease; residual effects of possible transient ischemic attack or cerebrovascular accident; shoulder capsulitis; cervicalgia; ulnar neuropathy; hypertension; obesity; depression; and anxiety."[1] (R. 20.) He found that Stacey did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 21.) "After careful consideration of the entire record," the ALJ found that Stacey had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to no more than six hours of standing and walking; can have no exposure to hazards or unprotected heights; can no more than occasionally perform other climbing (like ramps or stairs) or balancing on hazardous surfaces; can no more than occasionally perform overhead reaching and frequently perform handling and fingering; can have no more than occasional exposure to extreme cold; and is limited to no production work or pace work, such as an assembly line that is constantly moving, or a job with strict hourly quotas.

(R. 24.) As a result, the ALJ found that Stacey is unable to perform his past relevant work as a dietary director in a residential healthcare setting because the demands of that type of job exceed his RFC. (R. 33.) After considering Stacey's age, education, work experience, and RFC, however, the ALJ concluded that a significant number of jobs exist in the national economy that Stacey can perform, such as a routing clerk, mail-room clerk, and information clerk. (R.

---

[1] The ALJ also determined that Stacey's vision problems—"including hyperopia, astigmatism, presbyopia, keratoconus, and cataracts treated with surgery"—as well as his gastroesophageal reflux disease (GERD), closed fracture of the proximal phalanx of the right great toe, and history of COVID-19 infection prior to the alleged onset date were medically determinable impairments, but that they were not severe enough to render him disabled. (R. 20–21.) Stacey does not challenge this determination.

34.) Therefore, the ALJ determined that Stacey was not under a disability from October 20, 2021, through the date of his decision. (R. 35.)

## III.    ANALYSIS

Stacey challenges the ALJ's opinion on three grounds. First, he contends that the ALJ's assessment of his physical impairments and RFC findings "are not supported by substantial evidence[;]" namely, that the ALJ "failed to consider [his] obesity upon his other impairments and [his] RFC[,]" and that the ALJ failed to assess his "ability to sustain work activities over the course of an eight hour workday." (Pl.'s Br. at 27–28, 36–37.) Second, Stacey argues that the ALJ's assessment of his mental impairments "is not supported by substantial evidence" because the ALJ "failed to properly assess" the impact of Stacey's moderate limitations in concentrating, persisting, or maintaining pace on his RFC. (*Id.* at 37–38.) Third, Stacey contends that the ALJ's decision finding his allegations inconsistent with the medical evidence "is not supported by substantial evidence" because the "reasons given by the ALJ in rejecting [Stacey's] allegations are not supported by substantial evidence." (*Id.* at 44.)

A. Physical Impairments

1. Obesity

Stacey argues that the ALJ "failed to conduct any analysis of the impact of [his] obesity upon his other impairments" and did "not provide any actual explanation as to how he considered [Stacey's] obesity in arriving at his RFC findings." (Pl.'s Br. at 30–31.) The court disagrees.

"In making an RFC determination, an ALJ should consider the combined effect of all the claimant's medical impairments." *Kimberly W. v. Comm'r of Soc. Sec.*, No. 4:19-cv-00023, 2021

WL 827075, at *3 (W.D. Va. Mar. 3, 2021) (Report and Recommendation), *adopted by* 2021 WL

1232101 (W.D. Va. Mar. 31, 2021). "The regulations acknowledge that obesity may compound

the effects of other impairments[.]" *Id.* Thus, although obesity is not a listed impairment, the

functional limitations it causes, "either alone or in combination with another impairment(s),

may medically equal a listing." *David B. v. Bisignano*, No. 3:24-cv-623, 2025 WL 2155789, at *5

(E.D. Va. July 29, 2025) (quoting SSR 19-2p, 2019 WL 2374244, at *2 (May 20, 2019)).

Specifically,

> Social Security Ruling 19-2p recognizes that obesity can affect a
> person's exertional functions (such as sitting, standing, walking,
> lifting, carrying, pushing, and pulling), non-exertional functions
> (such as climbing, balancing, stooping, kneeling, crouching, and
> crawling), and environmental limitations (such as ability to
> tolerate extreme heat, humidity, or hazards). . . . In addition,
> obesity may affect a person's ability to manipulate objects as well
> as a person's range of motion in the skeletal spine and extremities
> due to increased stress on weight-bearing joints.

*Id.* (cleaned up) (citing SSR 19-2p, 2019 WL 2374244, at *2). Therefore, an ALJ "must consider

'the limiting effects of obesity' in determining the RFC, and must explain the conclusion

whether obesity causes any limitations." *Daisy F. v. Kijakazi*, No. 2:21-cv-563, 2022 WL

18936086, at *7 (E.D. Va. Dec. 15, 2022) (quoting SSR 19-2p, 2019 WL 2374244, at *4).

Courts in this Circuit have found that, when an ALJ completely fails to mention obesity and

when an ALJ "generally mention[s] obesity without including analysis or discussing the

relationship between obesity and other physical impairments and functional abilities," remand

is appropriate. *David B.*, 2025 WL 2155789, at *5 (citing *Daisy F.*, 2022 WL 18936086, at *7

and *Kimberly W.*, 2021 WL 827075, at *5).  In contrast, courts have affirmed in cases where the

ALJ "did not articulate a detailed discussion but showed that he or she considered the

applicable law and cumulative effects of the claimant's obesity." *Id.* (citing *Kevin F. v. O'Malley*, No. 5:23-cv-305, 2024 WL 604747, at *8 (S.D.W. Va. Jan. 26, 2024)). "Importantly, an ALJ's analysis of obesity does not need to be incredibly extensive, but there must be more than an 'utter lack of analysis' of the plaintiff's obesity." *Daisy F.*, 2022 WL 18936086, at *8 (quoting *Katherine T. v. Kijakazi*, No. 6:21-cv-7, 2022 WL 4477703, at *8–9 (W.D. Va. Sep. 26, 2022)).

Here, the ALJ's discussion was sufficient. In his opinion, the ALJ found that Stacey's obesity was a severe impairment, but concluded that the functional limitations caused by obesity—considered alone and in combination with Stacey's other medically determinable impairments—"do not medically equal any potential[ly] relevant listing." (R. 22.) In his RFC finding, moreover, the ALJ noted that he considered the "potential limiting effects of obesity . . . in evaluating [Stacey's] residual functional capacity." (R. 30.) The ALJ further explained:

> The longitudinal medical evidence shows body mass index (BMI) values in the mid- to high-30s around the alleged onset date, which gradually decreased into the low-30s in 2022 and the early part of 2023, and decreased further into the high-20s by about the middle of 2023. Though the claimant's current BMI is no longer in the obese range, the longitudinal record shows a consistent pattern of obesity that could foreseeably increase the claimant's reported pain and fatigue. Thus, obesity has been considered in finding that the claimant is restricted to performing a range of light work with no exposure to hazards or unprotected heights. However, the obesity does not appear to cause complications in the claimant's body to a degree that would cause greater work-related limitations beyond those stated above. As noted in the previous discussion, the claimant told providers he was able to lose weight through physical exercise and other lifestyle changes.

(*Id.*)

Though the ALJ's discussion on this score was brief, "there is not an 'utter lack of analysis'" of the effects of Stacey's obesity. *See Katherine T.*, 2022 WL 4477703, at *9. This case

is thus similar to *Katherine T. v. Kijakazi*, where a court in this district found that the ALJ's discussion of obesity was adequate where the ALJ "found obesity to be a severe impairment at step two, . . . and discussed obesity pursuant to SSR 19-2p at step three[,]" and provided a short explanation of how the claimant's obesity impacted the RFC findings at step four. *Id.* Specifically, the ALJ in that case stated that "the potential limiting effects of obesity have been considered in finding that the claimant is restricted to a range of sedentary work" and that the claimant's "obesity could exacerbate her pain and edema." *Id.* The ALJ then concluded that, despite these limitations, the claimant's obesity—even considered in combination with other physical impairments—"does not appear to cause complications in the claimant's body to a degree that would cause further work-related limitations beyond those stated above." *Id.* The ALJ's discussion here provides more details as to why he found that Stacey's obesity does not require further RFC limitations than those he listed—namely, that Stacey has been able to lose weight through diet and exercise and that his BMI is no longer in the obese range. (R. 30.) The ALJ also referenced Stacey's weight loss and regular exercise while analyzing how his other physical impairments, such as his diabetes mellitus and stroke-related symptoms, affect his RFC. (R. 29.)

Stacey cites two cases in support of his position that the ALJ's discussion of his obesity was insufficient: *Kimberly W.*, 2021 WL 827075, at *5, and *Bradberry v. Astrue*, No. 7:11-cv-235, 2011 WL 6296738, at *4 (W.D. Va. Dec. 15, 2011). They are inapposite. In *Kimberly W.*, the ALJ found obesity to be a severe impairment and cited the Regulations for obesity in his step three analysis, but he "did not otherwise discuss the standard for ALJ's [sic] to evaluate the effects of a claimant's obesity on her functional abilities at any of the other steps of his

analysis." 2021 WL 827075, at *5. The court found that the "ALJ's utter lack of analysis or explanation constitutes a near total failure to examine the effects of Kimberly's obesity." *Id.* In *Bradberry*, the ALJ concluded that the claimant was not disabled because she did not follow recommendations from her physicians to exercise regularly and follow a heart-healthy diet. 2011 WL 6296728, at *4. The court found that the ALJ misapplied SSR 02-1p (the precursor to SSR 19-2p) because the Social Security Commission issued guidance pertaining to that regulation that "[w]e will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits." *Id.* (quoting SSR 02-1p, 67 Fed. Reg. at 57864). Due to this error—and also because the rest of the ALJ's decision indicated that the claimant's obesity was given little, if any, weight in the formulation of her RFC—the court reversed the Commissioner's decision and remanded the case. *Id.* Here, conversely, the ALJ properly explained how he considered obesity pursuant to SSR 19-2p and analyzed Stacey's obesity—both separately and in combination with other impairments when assessing Stacey's RFC.

2. <u>Stacey's ability to sustain work activities during an eight-hour workday</u>

Stacey next argues that the ALJ "failed to properly consider whether [his] pain is so continuous and/or severe that it prevents [him] from working an eight hour workday." (Pl.'s Br. at 35.) In particular, he contends that the ALJ cherry-picked medical evidence showing that his impairments improved over the course of 2022 but "ignored the findings in 2023 of decreased strength in the upper and lower extremities in arriving at his conclusions and RFC findings." (*Id.*) Additionally, Stacey argues that the ALJ "failed to account for the fact that [his] impairments result in waxing and waning of his symptoms which also impacts his residual functional capacity." (*Id.* at 36.) Again, the court disagrees.

The Fourth Circuit has held that, for certain chronic conditions like fibromyalgia and depression, an ALJ must account for "waxing and waning" symptoms as well as consider the longitudinal record of the claimant's symptoms as a whole. *See Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 101 (4th Cir. 2020); *Shelley C. v. Comm'r Soc. Sec. Admin.*, 61 F.4th 341, 368 (4th Cir. 2023). An ALJ fails to do so when he cites only treatment notes that indicate that the claimant's condition is improved or stable, while omitting evidence concerning the severity of the claimant's symptoms. *See Arakas*, 983 F.3d at 101–02; *Shelley C.*, 61 F.4th at 368; *Handy v. Bisignano*, No. 5:24-cv-331, 2025 WL 2723537, at *5 (E.D.N.C. Sep. 24, 2025) (holding that the ALJ failed to consider the waxing and waning nature of the claimant's major depressive disorder where she failed to discuss evidence in the record that showed intensification of the claimant's symptoms and undermined the "narrative of a trajectory of improvement.").

Here, the ALJ provided a detailed summary and chronology of Stacey's symptoms related to his diabetes mellitus and stroke-related residual effects. He noted that "the medical evidence of record shows increased signs and symptoms in the period shortly after the onset date[,]" which included worsening imbalance and several falls, an overnight hospitalization due to stroke-like symptoms, and continued weakness and imbalance. (R. 27–28.) The ALJ also detailed multiple positive Romberg tests, an MRI showing abnormal findings consistent with a pontine infarct, and physical examinations indicating atrophy in his hand and finger muscles. (R. 28.) Additionally, the ALJ described Stacey's shoulder and hand problems, including physical examinations revealing tenderness and palpation in the right shoulder, range of motion loss, and an X-ray revealing moderate acromioclavicular joint osteoarthritis and a calcific lesion at the disc clavicle. (R. 29.) The ALJ then extensively cited to medical evidence

indicating that Stacey's symptoms improved throughout 2022 and 2023, finding that Stacey's allegations as to the intensity and persistence of his symptoms "are not entirely consistent with other evidence in the record." (R. 28–30.) But the ALJ did not ignore the general waxing and waning of Stacey's symptoms.[2] For instance, the ALJ noted that at various appointments in 2023, Stacey reported left-sided weakness, numbness in his right foot when driving, intermittent pain in his shoulder, an inability to lay on his left side, and continued range of motion loss. (R. 29–30.) The ALJ balanced these recurring symptoms against the medical evidence and Stacey's own statements to his healthcare providers and hearing testimony to conclude that his symptoms were improving and became stable through treatment. "Such weighing remains permissible under *Shelley C.* and *Arakas*." *Lasharne W. v. Comm'r Soc. Sec. Admin.*, No. SAG-21-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023). The ALJ's lengthy narrative regarding the trends in Stacey's symptoms, his course of treatment, and his increasing ability to perform daily tasks further support his conclusion that Stacey can sustain work activities over the course of an eight-hour workday. *See Darrell J. v. Kijakazi*, No. 7:21-cv-325, 2022 WL 6627107, at *7 (W.D. Va. Sep. 2, 2022).

### B. Mental Impairments

Stacey argues that the ALJ failed to "explain how his RFC findings address or accommodate [Stacey's] moderate limitations in concentrating, persisting, or maintaining

---

[2] It is worth noting that Stacey "does not identify any case law" that his diagnosis of diabetes mellitus, his stroke-related residual effects, and his shoulder and hand pain "require a finding of disability based on the waxing and waning nature of those impairments alone. Nor has [he] identified any case law or regulations indicating that the waxing and waning nature of these conditions must specifically be considered by the ALJ." *Jennine C.M. v. O'Malley*, No. 9:22-3066, 2024 WL 911523, at *6 (D.S.C. Mar. 4, 2024). The court, too, cannot find any such case law.

pace[,]" and "said nothing about [Stacey's] ability to perform the RFC findings for a full workday[.]" (Pl.'s Br. at 38–39.) The court disagrees.

An ALJ must use a "special technique" when determining if a claimant has a severe mental impairment. *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017). That is, the ALJ must make "a specific finding as to the degree of limitation" in each of the four areas of functional limitation listed in 20 C.F.R. § 404.1520(e). *Id.* (quoting 20 C.F.R. § 404.1520(e)(4)). In other words, the ALJ must determine the extent to which the mental impairment interferes with a claimant's ability to function. "An ALJ who identifies a moderate limitation in [concentration, persistence, and pace ("CPP")] at step three must either account for that limitation in the claimant's RFC or explain why doing so is unnecessary." *Robert S. v. Saul*, No. 5:19-cv-00055, 2021 WL 276170, at *5 (W.D. Va. Jan. 27, 2021). An ALJ cannot simply restrict the claimant to "simple, routine tasks or unskilled work" because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). The ALJ, then, must include a narrative discussion in his decision, "citing relevant evidence in the record, explaining either how the RFC accommodates the ALJ's finding that the claimant's mental impairment(s) cause 'moderate' overall limitations in sustaining CPP or why . . . this moderate limitation 'does not affect' the claimant's ability to 'stay on task' for a full workday and normal workweek." *Shannon R. v. Kijakazi*, 2022 WL 636638, at *9 (W.D. Va. Mar. 4, 2022) (quoting *Mascio*, 780 F.3d at 638).

In his opinion, the ALJ found that Stacey's depression and anxiety were severe impairments. (R. 20.) The ALJ then found that Stacey had a moderate limitation in CPP

because he alleged problems with concentrating and completing tasks, in addition to reporting other mental-health symptoms that "could be expected to interfere in this area." (R. 23.) He further explained that although "a few treatment notes show 'limited' attention and concentration at times[,] . . . [m]ost treatment notes describe [Stacey] as otherwise alert and oriented, with normal speech and good attention and concentration." (*Id.*) The ALJ also noted Stacey's "reported activities, such as driving short distances, shopping, and working part-time, also demonstrate some capability in this area." (R. 24.) After explaining the basis for his finding, the ALJ stated that he considered Stacey's moderate limitation in CPP in finding that Stacey "is limited to no production rate or pace work, such as no assembly line that is constantly moving, or a job with strict hourly quotas." (*Id.*)

At step four, the ALJ detailed how Stacey "reported increased anxiety, depression, and stress in November 2021, shortly after losing his job[,]" and that "[t]he outpatient records show common themes of frustration, anger, stress over finances and health, anxiety, insomnia, and thoughts of death, though no suicidal ideation." (R. 30.) Additionally, the ALJ noted how Stacey said that "he did well at work but when he came home, he could not even concentrate when watching TV." (R. 31.) The ALJ then explained that

> [i]t is reasonable to expect that [Stacey's] psychiatrically[]based signs and symptoms would interfere in his ability to maintain pace in a production-oriented environment. Accordingly, the undersigned has considered [Stacey's] mood and anxiety disorders in finding that the claimant is limited to no production rate or pace work as defined in the above residual functional capacity finding.

(*Id.*) The ALJ then provided a detailed explanation as to why he did not further limit Stacey's RFC—namely, recounting various mental-status examinations over time, treatment records

that "document meaningful relief of the mental[-]health symptoms with routine outpatient treatment[,]" and Stacey's own statements regarding his mental state. (R. 31–32.) Accordingly, the ALJ did much more than simply restrict Stacey to "simple, routine tasks or unskilled work." *See Mascio*, 780 F.3d at 638.

The Fourth Circuit has held that "when an ALJ finds a claimant has moderate limitations in concentration, persistence, or pace, the ALJ is expected to include specific conclusions about how the claimant's 'mental limitations affect [his] ability to perform job-related tasks for a full workday." *Mark T. v. Berryhill*, No. CBD-18-0513, 2019 WL 2250575, at *4 (D. Md. May 23, 2019) (quoting *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019)). Additionally, "when an ALJ includes specific terminology in the limitations included in an RFC assessment, [he] must provide sufficient information so that the courts can understand what is meant by the term." *Id.* Specifically, the *Thomas* court held that the ALJ did not provide sufficient information when she stated that Thomas "could not perform work 'requiring a production rate or demand pace'" because those terms are "not common enough for us to know what they mean without elaboration." *Thomas*, 916 F.3d at 312. This holding, however, "did not create a categorical rule that failing to define certain terms constitutes a reversible error." *Taylor v. Saul*, No. 3:19-cv-468, 2020 WL 4340536, at *6 (E.D. Va. July 27, 2020). "Instead, the Fourth Circuit has clarified that a reviewing court's ability to understand phrases such as 'production rate of pace' in an ALJ's opinion depends on the phrase's context and use." *Brian S. v. Saul*, No. 3:20-cv-065, 2021 WL 748087, at *11 (E.D. Va. Feb. 10, 2021).

The Fourth Circuit, and various district courts within this Circuit, have affirmed where "the ALJ offered an explanation for what he meant by 'no production-rate or paced-rate

work."' *Nelson v. Saul*, No. 4:18-cv-163, 2019 WL 4748028, at *5 (E.D.N.C. Aug. 29, 2019)

(finding the ALJ's explanation sufficient where he elaborated that no production-rate or

paced-rate work included no assembly-line work and included other limitations, such as a low-

stress job, no interaction with the public, and occasional interaction with coworkers); *see also*

*Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017) (holding that the ALJ accommodated the

claimant's moderate CPP limitations where he found that he should work in "low[-]stress non-

production jobs with no public contact."); *Brian S.*, 2021 WL 748087, at *12 (finding the ALJ's

explanation sufficient where he "followed 'production rate pace' with further description: 'as

that found in an assembly-line setting and with instructions that were primarily spoken rather

than written.'"). Here, the ALJ explained that "no production rate or pace work" meant that

Stacey could not work in an environment where an assembly line is "constantly moving" or

where there are "strict hourly quotas." (R. 24.) Though the ALJ did not provide the most

detailed description, it "was sufficient for the court to meaningfully review the RFC" because

"the court is not left to guess what the ALJ meant." *Nelson*, 2019 WL 4748028, at *5. The

ALJ's description permits the court "to understand that, to allow for [Stacey's] moderate

limitations in maintaining concentration, persistence, and pace, [Stacey] shall not be required

to perform tasks within a certain time allotment, like what would be present in an assembly-

line setting." *See Brian S.*, 2021 WL 748087, at *12. Further, the ALJ's RFC finding as it pertains

to Stacey's mental limitations is supported by substantial evidence because it was preceded by

a "chronological narrative of [Stacey's] testimony, alleged symptoms, medical record, and

opinion evidence." *See id.* at *11.

    C.  Stacey's Subjective Allegations

Finally, Stacey argues that the ALJ's decision regarding Stacey's allegations—that his allegations were not "entirely consistent with the evidence of record"—"is not supported by substantial evidence and should be rejected as insufficient." (Pl.'s Br. at 42.) Specifically, Stacey contends that, although the ALJ looked at his daily activities, he "failed to consider the extent to which [Stacey] actually performed the activities and ignored other significant testimony from [Stacey]." (*Id.* at 43.) As with Stacey's other arguments, the court disagrees.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Darrell J.*, 2022 WL 6627107, at *8. The ALJ first looks for "objective medical evidence showing a condition that could reasonably produce the alleged symptoms[.]" *Id.* The ALJ then must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work." *Id.* To make that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." 20 C.F.R. § 404.1529(c).

Though an ALJ may not discredit a claimant's allegations regarding his pain "solely because they are not substantiated by objective evidence of the pain itself or its severity," the ALJ need not accept those allegations "to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment[.]" *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996). "Importantly, the [c]ourt's role is not to reweigh evidence considered by the ALJ." *Katherine T.*, 2022 WL 4477703, at *10 (citing *Hancock v. Astrue*, 667 F.3d 470, 476

- 27 -

(4th Cir. 2012)). Rather, "[a] reviewing court gives great weight to the ALJ's assessment of a claimant's statements" and "will defer to the ALJ's credibility finding except in those 'exceptional' cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Darrell J.*, 2022 WL 6637107, at *8.

Stacey contends that the ALJ did not consider or incorrectly weighed his testimony that he struggled with his fine motor skills; required regular breaks and accommodations at work; had difficulty balancing, lifting, and reaching; that he cannot sit or stand more than 45–60 minutes; among other allegations. (Pl.'s Br. at 41–42.) He is incorrect. As discussed above (*see supra* Part III.A.2), the ALJ provided an extensive summary of Stacey's subjective allegations and his testimony at the hearing and thoroughly reviewed and assessed them along with his treatment records and medical opinion evidence. (R. 25–33.) After reviewing the subjective and objective evidence and accounting for the waxing and waning of Stacey's symptoms as well as his relative stability since 2022, the ALJ found that the State agency medical consultants' physical assessments, while "mostly persuasive[,]" were "not entirely consistent with other evidence showing that [Stacey] is more limited with respect to manipulative activities, considering his mild hand weakness and atrophy as observed in 2022, and his continued reports of shoulder and neck symptoms after that." (R. 32 (cleaned up).) The ALJ added additional limitations to Stacey's RFC not included by the medical consultants; namely, that Stacey "should have reduced exposure to extreme cold in order to avoid exacerbating his neuropathy symptoms, considering his reports of numbness[,]" and that he is more limited in CPP, "considering his reports of symptoms that could interfere in this

- 28 -

area[.]" (R. 32–33.) The ALJ's imposition of additional restrictions on Stacey's RFC demonstrates that he credited Stacey's subjective allegations and testimony, which showed that Stacey continues to suffer as a result of his physical and mental impairments. The ALJ especially credited Stacey's allegations of neck and back pain, motor skill difficulty, numbness, and difficulty with staying on task. Therefore, he clearly considered Stacey's allegations and testimony. "[S]imply inferring that the ALJ did not discuss certain evidence as completely as desired, without more, is not sufficient grounds for remand." *Nancy W. v. O'Malley*, No. 7:23-cv-00033, 2024 WL 1886561, at *7 (W.D. Va. Feb. 16, 2024).

Stacey also argues that the ALJ failed to consider the extent to which he actually performed the daily activities cited in his discussion. He relies on *Brown v. Commissioner Social Security Administration*, in which the Fourth Circuit held that the ALJ failed to acknowledge the claimant's ability to do his daily activities at only a minimal level and "provided no explanation as to how those particular activities . . . showed that he could persist through an eight-hour workday." 873 F.3d 251, 263 (4th Cir. 2017). Here, unlike in *Brown*, the ALJ looked to more than Stacey's daily activities to discount his alleged symptoms, including a detailed account of his medical records and his own statements to his treating physicians that some of his symptoms were improving. (R. 29–31.) The ALJ "did not rely on minimal daily activities for the finding of non-disability[;]" rather, he used Stacey's "daily activities as a factor in his assessment of [Stacey's] subjective allegations." *Timothy H. v. Kijakazi*, No. 7:21-cv-00271, 2022 WL 4295634, at *7 (W.D. Va. Aug. 1, 2022) (citing *Ladda v. Berryhill*, 749 F. App'x 166, 173 n.4 (4th Cir. 2018)). The ALJ only briefly mentioned Stacey's ability to perform daily activities—such as driving short distances, going to the gym, working part-time, and doing

household chores—and cites these activities as a few of many reasons for his conclusion that Stacey's subjective allegations are not entirely consistent with the other evidence of record. (*See, e.g.*, R. 28–29 (discussing physician reports and medical testing showing that Stacey's diabetes and post-stroke symptoms were improving); R. 30 (explaining that Stacey's shoulder pain was improving with physical therapy, injections, and chiropractic interventions, and citing physical examination showing "unremarkable findings"); R. 31 (discussing mental-health provider reports and treatment records showing Stacey's relative mental stability and improvement with routine outpatient treatment).) Moreover, the ALJ acknowledged Stacey's limits in completing his activities of daily living, such as his foot becoming numb when driving for longer than 20 miles, his ability to exercise for only 20 minutes at a time, his stress at work, and his inability to concentrate when watching TV at home. (R. 29, 31.) Accordingly, the ALJ supported his analysis of Stacey's subjective complaints with substantial evidence.

## IV. CONCLUSION

The court has reviewed the remainder of the ALJ's decision and the record evidence and is satisfied that the ALJ's decision is supported by substantial evidence. For this and the foregoing reasons, Stacey's motion for summary judgment will be denied, and the Commissioner's decision will be affirmed.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 17th day of February, 2026.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE